# VIRGINIA *v.* AMERICAN BOOKSELLERS ASSOCIATION, INC., ET AL.

No. 86–1034.   Argued November 4, 1987—Decided January 25, 1988

BRENNAN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, MARSHALL, BLACKMUN, O'CONNOR, and SCALIA, JJ., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 398.

*Richard B. Smith*, Assistant Attorney General of Virginia, argued the cause for appellant. With him on the briefs were *Mary Sue Terry*, Attorney General, and *Mark R. Davis*, Assistant Attorney General.

*Paul M. Bator*, argued the cause for appellees. With him on the brief were *Kenneth S. Geller, Mark I. Levy, Michael A. Bamberger, David C. Burger, Maxwell Lillienstein*, and *Burton Joseph.**

---

*Briefs of *amici curiae* urging reversal were filed for the city of Minneapolis by *Robert J. Alfton* and *David M. Gross;* for the Institute for Youth Advocacy by *Gregory A. Loken;* and for the National Legal Foundation by *Paul S. McConnell* and *Robert K. Skolrood.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Charles S. Sims, John A. Powell*, and *Steven R. Shapiro;* for the Freedom to Read Foundation by *Bruce J. Ennis* and *David W. Ogden;* and for Jean M. Auel et al. by *R. Bruce Rich.*

JUSTICE BRENNAN delivered the opinion of the Court.

The courts below declared unconstitutional the following Virginia statute: "It shall be unlawful for any person . . . to knowingly display for commercial purpose in a manner whereby juveniles may examine and peruse" visual or written material that "depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles." Va. Code § 18.2–391(a) (Supp. 1987). The unique factual and procedural setting of this case leads us to conclude that an authoritative construction of the Virginia statute by the Virginia Supreme Court would substantially aid our review of this constitutional holding, and might well determine the case entirely. Accordingly, we certify two questions to the Virginia Supreme Court.[1]

## I

In 1968, this Court held consitutional a state prohibition on the sale to those under 17 of materials deemed "harmful to juveniles." *Ginsberg* v. *New York*, 390 U. S. 629, 643

---

[1] Rule 5:42(a) of the Rules of the Virginia Supreme Court states:

"*Power to Answer.* —The [Virginia] Supreme Court may in its discretion answer questions of law certified to it by the Supreme Court of the United States, a United States court of appeals for any circuit, a United States district court, or the highest appellate court of any state or the District of Columbia. Such answer may be furnished, when requested by the certifying court, if a question of Virginia law is determinative in any proceeding pending before the certifying court and it appears there is no controlling precedent on point in the decisions of the Supreme Court or the Court of Appeals of Virginia."

This opinion, along with a statement to be appended by the Clerk of the Court setting out the names, addresses, and telephone numbers of counsel for the parties and the names of each of the parties involved, shall constitute the certification order. Va. Sup. Ct. Rule 5:42(d). The Clerk of the Court shall also transmit to the Virginia Supreme Court the record in this case, including plaintiffs' exhibits and the trial transcript. Appellant shall bear the fees and costs on certification in the Virginia Supreme Court. Va. Sup. Ct. Rule 5:42(g). Such fees and costs shall be taxable items pursuant to this Court's Rule 50. Virginia's certification procedure became effective on April 1, 1987, and hence was unavailable to the courts below.

(1968). The next year, Virginia enacted a similar statute. The Virginia Code's current definition of "harmful to juveniles" is a modification of the *Miller* definition of obscenity, adapted for juveniles. *Miller* v. *California*, 413 U. S. 15, 24 (1973). The statute reads in relevant part:

> "'Harmful to Juveniles' means that quality of any description or presentation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it (a) predominately appeals to the prurient, shameful or morbid interest of juveniles, (b) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for juveniles, and (c) is, when taken as a whole, lacking in serious literary, artistic, political or scientific value for juveniles." Va. Code § 18.2–390(6) (1982).

In 1985, Virginia amended its law to make it also a crime "to knowingly display for commercial purpose in a manner whereby juveniles may examine and peruse" the aforementioned materials, even if these materials are not actually sold to any juvenile.[2]

---

[2] The law, with the 1985 amendment italicized, reads as follows:

"Definitions. —As used in this article:

"(1) 'Juvenile' means a person less than eighteen years of age.

[Subsections (2–5) define "Nudity," "Sexual conduct," "Sexual excitement," and "Sadomasochistic abuse," respectively.]

"(6) 'Harmful to Juveniles' means that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it (a) predominately appeals to the prurient, shameful or morbid interest of juveniles, (b) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for juveniles, and (c) is, when taken as a whole, lacking in serious literary, artistic, political or scientific value for juveniles.

"(7) 'Knowingly' means having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both (a) the character and content of any material described herein which is reasonably susceptible of examination by the defendant, and (b) the age of the juvenile, provided however, that an honest mistake shall constitute an excuse from liability hereunder if the defendant made a rea-

Plaintiffs made a facial challenge to the 1985 amendment in the United States District Court for the Eastern District of Virginia.[3] They asserted that the 1985 amendment was fundamentally different from the prior statute in that it burdens the First Amendment rights of adults, as to whom at least some of the covered works are not obscene. They argued that, while the *sale* provision does not affect adult access to covered works in any significant way, as the Court held in *Ginsberg, supra,* at 634–635, the 1985 amendment, governing the *display* of such works to minors, substantially restricts access to adults because of the economically devastating and

---

sonable bona fide attempt to ascertain the true age of such juvenile." Va. Code § 18.2–390 (1982).

Va. Code § 18.2–391 (Supp. 1987) reads:

"Unlawful acts. —(a) It shall be unlawful for any person knowingly to sell or loan to a juvenile, *or to knowingly display for commercial purpose in a manner whereby juveniles may examine or peruse:*

"(1) Any picture, photography, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles, or

"(2) Any book, pamphlet, magazine, printed matter however reproduced or sound recording which contains any matter enumerated in subdivision (1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sadomasochistic abuse and which taken as a whole, is harmful to juveniles.

. . . . .

"(e) Violation of any provision hereof shall constitute a Class 1 misdemeanor."

[3] Plaintiffs below included a number of organizations with memberships consisting of national and Virginia booksellers, two Virginia bookstores, and a Virginia adult and her juvenile child. The District Court dismissed the parent and child for failure to allege potential prosecution under the 1985 amendment, a potential economic injury flowing therefrom, or "anything more than an abstract interest in the availability of reading materials in bookstores, an interest which is no different from the interests of all other local citizens who patronize bookstores." *American Booksellers Assn.* v. *Strobel,* 617 F. Supp. 699, 704 (1985). The remaining plaintiffs are the appellees here.

extremely restrictive measures booksellers must adopt to comply. Specifically, they argued, compliance requires a bookseller to: (1) create an "adults only" section of the store; (2) place the covered works behind the counter (which would require a bookbuyer to request specially a work); (3) decline to carry the materials in question; or (4) bar juveniles from the store.[4] Plaintiffs maintained that because bookbuyers generally make their selections by browsing through displayed books, and because adults would be reluctant to enter an "adults only" store or section of a store, the statute effectively restricts the entire population's access to books that fall within its purview. In effect, argued plaintiffs, the law reduces the adult population to reading and viewing only works suitable for children, something this Court has repeatedly held is prohibited by the First Amendment. *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 73–74 (1983); *Butler* v. *Michigan*, 352 U. S. 380, 383–384 (1957). Consequently, they asserted, the law must undergo First Amendment scrutiny. Applying that scrutiny, plaintiffs reasoned that the law is unconstitutional because the State's interest in restricting the display of these works is insubstantial and the law does not further this interest by the least restrictive means available. In support of that proposition, plaintiffs argued that the statute criminalizes the mere *display* of covered works, even if there is no evidence that a juvenile would *actually* examine and peruse them.

Plaintiffs also maintained that the law is overbroad in that it restricts access by mature juveniles to works that are "harmful" only to younger children. Finally, the statute is purported to be unconstitutionally vague, in part because it is

---

[4] There are a number of different types of booksellers in Virginia. Some are traditional bookstore owners. Others include, for example, grocery store owners, drugstore owners, and airport convenience store owners who have one or more book or magazine racks. The ability of these diverse types of booksellers to utilize the differing methods of compliance varies.

allegedly impossible to determine what standard should be used in deciding whether a work is appropriate for juveniles of different ages and levels of maturity.[5]

Plaintiffs brought suit under 42 U. S. C. § 1983 against the Arlington County Chief of Police. Pursuant to 28 U. S. C. § 2403(b), the Virginia Attorney General intervened. The defendants argued that the 1985 amendment is a necessary corollary to the prior sales restriction, as one without the other is useless. Defendants also challenged plaintiffs' reading of the statute's reach, arguing that it extends only to "borderline obscenity." Further, compliance with the statute may be achieved, they maintained, by placing distinctive tags on the restricted materials, or placing them behind "blinder racks." Therefore, they asserted the statute has no significant "spillover" effect on adults, and any effect there might be is permissible under a "time, place, or manner" test. Even under strict First Amendment scrutiny, they argued, the 1985 amendment is constitutional due to the State's compelling interest in protecting juveniles and the lack of a less restrictive alternative to achieve effectively that interest.

Plaintiffs moved for a preliminary injunction, and defendants moved to dismiss or abstain. At the preliminary injunction hearing, which became a trial on the merits, plaintiffs called three witnesses: two booksellers (the owners of the two plaintiff bookstores) and the general counsel of plaintiff American Booksellers Association. The two booksellers testified that their stores were typical in most respects of non-"adults only" general-subject bookstores in the State. The booksellers introduced as exhibits a total of 16 books that they believed were examples of books the amended statute covered, and testified that the law might apply to as much as

[5] Plaintiffs argued that these problems do not arise in the context of the original statute, which regulates only the *sale* of certain materials. According to plaintiffs and the Court of Appeals, at the point of *sale* a bookseller can make an individualized determination as to the suitability of a specific item for a specific child. 802 F. 2d 691, 695, n. 7 (CA4 1986).

one half of their inventory. The exhibits were extremely diverse, including classic literature, health texts, poetry, photography, and potboiler novels. Finally, all three witnesses testified as to the steps they believed a bookseller would have to take to conform to the statute, repeating the four options discussed above. On cross-examination, defendants elicited testimony from the bookstore owners that they were unfamiliar with the portion of the law defining "harmful to juveniles." Therefore, defendants submitted that the plaintiffs' witnesses were testifying under a mistaken impression as to the statute's coverage.

The trial court denied defendant's motion to dismiss the case and declined to abstain. On the merits, it held as a factual matter that the statute would cover between 5 and 25 percent of a typical bookseller's inventory. Further, the court agreed with plaintiffs as to the alternatives available to comply with the law, rejecting defendants' suggestion that a bookseller could avoid criminal prosecution by merely tagging the materials or placing them behind "blinder" racks. The court reasoned from this that the 1985 amendment placed significant burdens on adult First Amendment rights by restricting adult access to nonobscene works. It concluded that the 1985 amendment was overbroad, and permanently enjoined its enforcement.

The Court of Appeals for the Fourth Circuit affirmed. 802 F. 2d 691 (1986). While critical of the evidentiary basis for the determination, the court neither accepted nor rejected expressly the District Court's finding as to the scope of the statute. *Id.*, at 696. At the same time, however, the court stated that "[i]t cannot be gainsaid" that book retailers would face significant difficulty attempting to comply with the statute. The Court of Appeals, like the District Court, adopted plaintiffs' theory as to the acceptable modes of compliance with the statute and rejected the Attorney General's alternatives, reasoning that tagging the materials or placing them behind blinder racks would not, as a practical matter, deter

juveniles from examining and perusing the works. The court questioned whether treating all juveniles identically was constitutional, but did not determine the issue.

The State appealed to this Court, alleging a conflict among the Courts of Appeals. See *Upper Midwest Booksellers Assn.* v. *Minneapolis,* 780 F. 2d 1389 (CA8 1985) (holding a similar ordinance constitutional), and *M. S. News Co.* v. *Casado,* 721 F. 2d 1281 (CA10 1983) (same). We noted probable jurisdiction. 479 U. S. 1082 (1987).

## II

We first address plaintiffs' standing to bring suit. The State argued before the District Court that plaintiffs lacked standing to bring a pre-enforcement facial challenge, alleging that plaintiffs did not suffer sufficient harm, and what harm they did suffer was economic, not speech related. Further, the State argued that plaintiffs' challenge was premature, having been made before the statute became effective.

To bring a cause of action in federal court requires that plaintiffs establish at an irreducible minimum an injury in fact; that is, there must be some "'threatened or actual injury resulting from the putatively illegal action . . . .'" *Warth* v. *Seldin,* 422 U. S. 490, 499 (1975), quoting *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617 (1973); see also *Association of Data Processing Service Organizations* v. *Camp,* 397 U. S. 150, 151–154 (1970). That requirement is met here, as the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution. See *Craig* v. *Boren,* 429 U. S. 190, 194 (1976); *Doe* v. *Bolton,* 410 U. S. 179, 188 (1973).

Even if an injury in fact is demonstrated, the usual rule is that a party may assert only a violation of its own rights. However, in the First Amendment context, "[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence

may cause others not before the court to refrain from con-stitutionally protected speech or expression.'" *Secretary of State of Maryland* v. *J. H. Munson Co.*, 467 U. S. 947, 956–957 (1984), quoting *Broadrick* v. *Oklahoma*, 413 U. S. 601, 612 (1973). This exception applies here, as plaintiffs have alleged an infringement of the First Amendment rights of bookbuyers.[6]

We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume oth-erwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them. Further, the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.

### III

We have concluded that we should not attempt to decide the constitutional issues presented without first having the Virginia Supreme Court's interpretation of key provisions of the statute. Several factors combine in a unique way to counsel that course.

At oral argument the State's attorney[7] conceded that if the statute is read as plaintiffs contend, not only is it uncon-stitutional but its enforcement *should*, as a normative mat-ter, be enjoined. Indeed, he seemingly conceded that if any of the books introduced as plaintiffs' exhibits below is cov-ered by the statute, plaintiffs should prevail.[8] However,

---

[6] The complaint also alleged a violation of plaintiffs' own First Amend-ment right to display the restricted works, but that claim was not passed on below and is not pressed here.

[7] The term "State's attorney" refers to Mr. Smith, the Assistant Attor-ney General who argued the case.

[8] After noting that plaintiffs have asserted that the statute covers the broad range of works represented by their exhibits below, the State's at-torney said:

"If that range is correct, if they are correct that this amendment involves that material, then we lose the case, and I submit to the Court that we

the State argues that the statute's coverage is much narrower than plaintiffs allege or the courts below found. It contends that the statute covers only a very few "borderline" obscene works, and none of the exhibits introduced by plaintiffs.[9]

There was testimony below that if the coverage of the statute is as narrow as the State argues, it would reach less than a single shelf of a typical bookseller's wares. App. 222. If that is true, methods of compliance exist that are substantially less burdensome than those discussed by the lower courts. For example, as is currently done in one of the plaintiff bookstores, a single shelf containing restricted books can be located within sight of the bookseller. If a juvenile examines or peruses the materials, an employee can prevent his continuing to do so. *Id.*, at 207. This is not to say that the law might not still raise substantial constitutional questions. However, the nature of the First Amendment "spillover" burden to adults would be dramatically altered.

Plaintiffs, pointing to the lower courts' interpretation of the law, paint a strikingly different picture. They see the statute as a broad enactment, potentially applying to a huge number of works. This is not a law, they say, covering only "borderline obscenity," but rather a device expunging from display up to a quarter of the books available to juveniles

---

*should* lose the case, because the Commonwealth of Virginia does not desire to restrict in any way, directly or indirectly, that type of material.

.    .    .    .    .

"I will wager this case on one exhibit, Plaintiff's Exhibit Number 4, The Penguin Book of Love Poetry. *If that book falls within this statute, then we concede the case.* You don't have to look at all of them. Just look at that one book. Or if you want to look at all of them, *the same thing goes for all of them . . . .*" Tr. of Oral Arg. 4, 19, (emphasis added).

[9] We note that in her brief to the Court of Appeals, the Attorney General conceded, or appeared to concede, that one of the exhibits, Hollywood Wives, would be covered. Opening Brief for Appellant Commonwealth of Virginia in Nos. 85–1961(L), 85–1999, pp. 27–28. At oral argument before this Court, that apparent concession was disclaimed. Tr. of Oral Arg. 5.

and, as a practical matter, to adults. The courts below similarly regarded the coverage; for a law, like Virginia's, that applies to up to 25 percent of a typical bookstore's inventory (as the District Court held) or that would confront booksellers with a "substantial problem" of compliance (as the Court of Appeals stated) must extend beyond only the nearly obscene. This broader reading of the statute would raise correspondingly greater First Amendment questions.

This Court rarely reviews a construction of state law agreed upon by the two lower federal courts. *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 499–500 (1985). However, this case presents the rare situation in which we cannot rely on the construction and findings below. There is no reliable evidence in the record supporting the District Court's holding that the statute reaches up to 25 percent of a typical bookstore, since the two bookstore owners who testified were unfamiliar with the statutory definition of "harmful to minors." We cannot tell whether the court's finding was based on an independent determination by the District Judge, as plaintiffs suggest, or the flawed testimony. But even if the holding were based on the former, we cannot discern the evidentiary basis for it. Neither can we rely on the Court of Appeals' construction. That court criticized the basis of the District Court's holding, but gave no alternative basis for its own determination. Given this history we are reluctant to adopt without question the lower courts' interpretation of state law. At the same time, as the Attorney General does not bind the state courts or local law enforcement authorities, we are unable to accept her interpretation of the law as authoritative.

Under these unusual circumstances, where it appears the State will decline to defend a statute if it is read one way and where the nature and substance of plaintiffs' constitutional challenge is drastically altered if the statute is read another way, it is essential that we have the benefit of the law's authoritative construction from the Virginia Supreme Court.

Certification, in contrast to the more cumbersome and (in this context) problematic abstention doctrine, is a method by which we may expeditiously obtain that construction. See *Bellotti* v. *Baird*, 428 U. S. 132 (1976) (remanding with instructions to certify questions pertaining to construction of a state statute that was susceptible to multiple interpretations, one of which would avoid or substantially modify a federal constitutional challenge). Consequently, we shall resort to its certification Rule 5:42 to ask the Virginia Supreme Court whether any of the books introduced by plaintiffs as exhibits below fall within the scope of the amended statute, and how such decisions should take into account juveniles' differing ages and levels of maturity.

We will also certify a second question. At oral argument, in response to a question from the bench, the State's attorney declared that a bookseller will not be subject to criminal prosecution if, as a matter of store policy, the bookseller prevents a juvenile observed reviewing covered works from continuing to do so, even if the restricted materials are not segregated.[10]

---

[10] The following colloquy occurred at oral argument:

"QUESTION: Mr. Smith, suppose a bookseller does not segregate books. Would he be able to comply with the Virginia statute by simply saying, whenever I see a juvenile, a person who looks to me like a juvenile, browsing in a book which is a book that I ought to know falls within this statute, I stop that juvenile and ask him to leave the store. That is my store policy.

*"Would that be enough to comply with the statute?*

"MR. SMITH: *Yes sir.*

.        .        .        .        .

"QUESTION: . . . I am talking about the language 'display for a commercial purpose in a manner whereby juveniles may examine and peruse.' 'May.'

"MR. SMITH: Because I think—

"QUESTION: 'May' means it is possible for them to do so or they are permitted to do so.

"MR. SMITH: This Court had a case which I have cited in my brief called the Foreign Products Case, and that case said that when used in a statute as this 'May' is used, it can mean might or it can mean reasonable

If this is what the statute means, the burden to the bookseller, and the adult bookbuying public, is significantly less than that feared and asserted by plaintiffs. (Even if the statute means that the bookseller is required to announce or manifest the store's policy, perhaps by appropriate signs in the store or other reasonable measures, the burdens might be less than under plaintiffs' construction.)

It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be "readily susceptible" to a narrowing construction that would make it constitutional, it will be upheld. *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205 (1975); *Broadrick* v. *Oklahoma*, 413 U. S. 601 (1973). The key to application of this principle is that the statute must be "readily susceptible" to the limitation; we will not rewrite a state law to conform it to constitutional requirements.

It is not necessary in this case, however, to decide whether the statute is readily susceptible of the Attorney General's current interpretation. The situation we confront is unusual. Another question is already being certified, enforcement of the statute will remain enjoined throughout the certification process, and no state court has ever had the opportunity to interpret the pertinent statutory language. In these circumstances, there is some advantage and no cost, either in terms of the First Amendment chilling effect or unnecessary delay, to certifying a proffered narrowing construction that is neither inevitable nor impossible. Thus, we certify this second question.[11]

---

certainty or it can mean actual tendency under Virginia law, since it has to be strictly construed against the Commonwealth, *it has to be what you have suggested, and it would qualify.*" Tr. of Oral Arg. 51–52 (emphasis added).

[11] The constitutional issues relating to the display of visual materials (Va. Code § 18.2–391(a)(1) (Supp. 1987)) are potentially different from those relating to the display of written works (§ 18.2–391(a)(2) (Supp. 1987)). However, we believe that answers to the certified questions will substantially aid us in resolving both inquiries.

## IV

Pursuant to Rule 5:42 of the Virginia Supreme Court, we respectfully certify to that court the following questions:

1. Does the phrase "harmful to juveniles" as used in Virginia Code §§ 18.2–390 and 18.2–391 (1982 and Supp. 1987), properly construed, encompass any of the books introduced as plaintiffs' exhibits below, and what general standard should be used to determine the statute's reach in light of juveniles' differing ages and levels of maturity?

2. What meaning is to be given to the provision of Virginia Code § 18.2–391(a) (Supp. 1987) making it unlawful "to knowingly display for commerical purpose in a manner whereby juveniles may examine or peruse" certain materials? Specifically, is the provision complied with by a plaintiff bookseller who has a policy of not permitting juveniles to examine and peruse materials covered by the statute and who prohibits such conduct when observed, but otherwise takes no action regarding the display of restricted materials? If not, would the statute be complied with if the store's policy were announced or otherwise manifested to the public?

*It is so ordered.*

JUSTICE STEVENS, concurring in part and dissenting in part.

A matter as important as the constitutionality of a state statute should not be decided on the basis of an advocate's concession during oral argument in this Court. The Assistant Attorney General was certainly correct when he conceded that a statutory restriction on the commercial display of The Penguin Book of Love Poetry would be unconstitutional, but it is less clear that *none* of the 16 exhibits introduced by the plaintiffs could be subjected to the statutory prohibition. Moreover, the colloquy that is partially quoted *ante,* at 393–394, n. 8, is neither entirely unambiguous nor

equivalent to a formal commitment by the State to dismiss the appeal if the Virginia Supreme Court advises us that one or more of the exhibits is covered by the statute. I would therefore modify the first certified question to ask the state court which, if any, of the plaintiff's exhibits is covered by the statute. Because the arguable literary, artistic, or scientific value of the exhibits varies widely, as does the character of the sexual references in the different books, an answer to the question I would ask would be of great help in understanding the reach of the statute and evaluating its validity. Accordingly, while I am in substantial agreement with what the Court has written, I respectfully dissent from the Court's refusal to ask the question that I have proposed.