**DEMOCRATIC NATIONAL COMMITTEE, et al.,**
**Plaintiff,**

v.

**Robert Y. WATADA, et al., Defendant.**

**Civil No. 02–00085 SOM/KSC.**

United States District Court,
D. Hawai'i.

April 11, 2002.

William C. McCorriston, Christopher Cole, McCorriston Miller Mukai MacKinnon LLP, Honolulu, HI, for plaintiffs Democratic National Committee, Jeremy Harris.

Christopher I.L. Parsons, Im Hanifin Parsons LLLC, Honolulu, HI, for plaintiff the Harris 2002 Campaign Committee.

Russell A. Suzuki, Gary H. Kam, Honolulu, HI, for defendants.

*AMENDED ORDER DISMISSING COMPLAINT WITHOUT PREJUDICE; ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION AS MOOT*

MOLLWAY, District Judge.

1. *INTRODUCTION.*

"This is a case in search of a controversy." *Thomas v. Anchorage Equal Rights*

*Comm'n,* 220 F.3d 1134, 1137 (9th Cir. 2000) (en banc). Plaintiff Mayor Jeremy Harris ("Harris") and his campaign committee, Plaintiff The Harris 2002 Campaign Committee ("Harris Campaign Committee"), have solicited and raised funds for Plaintiff Democratic National Committee (the "DNC"). According to his attorney, Harris promised to raise $100,000 for the DNC. In furtherance of this promise, Harris allegedly raised $86,950 in contributions in the form of checks made out to the DNC, not to Harris or the Harris Campaign Committee. Harris collected these contributions and sent them to the DNC. Harris then allegedly contributed $13,300 to the DNC from his own campaign funds to satisfy his promise to raise $100,000 for the DNC.

Defendant Robert Y. Watada ("Watada") is the Executive Director of Defendant Campaign Spending Commission (the "CSC").[1] Watada filed an administrative complaint with the CSC alleging that Harris' fund-raising activities for the DNC violated state campaign spending laws. The administrative complaint was less than clear as to the factual bases of the allegations. Not surprisingly, the CSC's Commissioners asked for further investigation of the issues raised by Watada's complaint. Watada then filed an Amended Administrative Complaint. At its next meeting, set for April 17, 2002, the Commission is scheduled to take up that Amended Administrative Complaint and to decide whether to dismiss it, to investigate its allegations further, or to take other action on it.

Before the CSC could evaluate Watada's complaint and determine how it would proceed, Plaintiffs rushed into this court, seeking an order enjoining Watada, the CSC, and the CSC's Commissioners (collectively "Defendants") from taking any action adverse to Plaintiffs. Defendants have yet to file their response to the Amended Administrative Complaint. The CSC has not yet stated whether it will or will not apply campaign spending laws to the factual allegations in the Amended Administrative Complaint.

Because Plaintiffs have not demonstrated that the mere filing of either the original or the Amended Administrative Complaint amounts to a credible threat to their First Amendment rights, Plaintiffs have failed to present a case or controversy to this court. The existence of a case or controversy is a constitutional prerequisite to this court's consideration of the merits of the motion for preliminary injunction. Accordingly, the court dismisses the Complaint (but not the action) without prejudice and denies Plaintiffs' motion for preliminary injunction as moot.[2] Plaintiffs are granted leave to amend their Complaint no later than April 30, 2002, if the CSC meets and does anything other than

[1] Watada and the CSC Commissioners are named in their official capacities only.

[2] On March 21, 2002, the court held a conference with counsel for the parties. At that conference, the court explained that it was concerned about whether this case satisfied Article III's case or controversy requirement and warned Plaintiffs that there was a possibility that this action would be dismissed. The court asked the parties whether they wanted to postpone the hearing on the motion for preliminary injunction to brief more fully the case or controversy issue. After the conference was recessed to permit discussion between the attorneys and their clients, Plaintiffs informed the court that they required no further opportunity to brief matters and that they wished to proceed with their motion for preliminary injunction in the face of a possible dismissal. The court noted that it might deem Defendants' opposition to the motion for preliminary injunction to be a motion to dismiss for lack of jurisdiction. In light of these discussions, Plaintiffs have waived any objection to the process by which jurisdiction is being addressed.

dismiss Watada's complaint. If they amend their Complaint, Plaintiffs may again move for injunctive relief. Although elsewhere in this order the court notes concerns about the administrative complaint, the court, not being able to anticipate what will occur, provides no assurance that any new motion will or will not be successful. If Plaintiffs do not amend their Complaint, the Clerk of the Court is directed to dismiss this action on or after May 1, 2002.

## 2. BACKGROUND.

Harris is the Mayor of the City and County of Honolulu, having been re-elected to that office in 2000. Harris has announced his candidacy for the office of Governor of the State of Hawaii. The election for that position is scheduled for the fall of 2002.

The CSC is the state agency charged with overseeing state campaign spending laws. In recent months, the Commissioners and Watada have clashed with Harris repeatedly over matters relating to both his mayoral and his gubernatorial campaigns. One of those many disputes is now before this court.

As the CSC's Executive Director, Watada is authorized to initiate an administrative complaint on behalf of the CSC. Haw. Rev.Stat. § 11–216(a) (Supp.2001).[3] Wata-

da may alternatively file such a complaint as a member of the public. *Id.*

The administrative complaint in issue here was filed by Watada and named as respondents Harris, The Harris 2000 Campaign Committee, and Roger Liu, the committee's treasurer.[4] Watada amended that complaint on March 15, 2002.

The Amended Administrative Complaint has four counts. Count I of that complaint alleges that Harris, the Harris Campaign Committee, and/or Liu violated Haw.Rev. Stat. §§ 11–200(a)(1) and 11–206, as well as Haw. Admin. R. 2–14.1–16, "when Harris expended $10,803.85 for numerous travel and lodging expenses not directly related to his campaign for Mayor of the City and County of Honolulu during the period of September 2000 through December 2000." Amended Administrative Complaint at 10. These travel and lodging expenses were apparently connected with Harris' trips to Washington, D.C., to meet with DNC officials. *Id.*

Section 11–200(a)(1), cited in Count I, provides:

(a) A candidate, campaign treasurer, or candidate's committee shall not receive any contributions or receive or make any transfer of money or anything of value:

(1) For any purpose other than that directly related:

**3.** This authority was not initially clear to the court, as the court had reviewed Michie's Hawaii Revised Statutes Annotated, which indicated that complaints initiated by the commission shall be signed by the "chairperson," not the "executive director." The official compilation of Hawaii Revised Statutes, however, makes it clear that, as the parties agreed, the Executive Director is authorized to sign a complaint initiated by the CSC. *Compare* Haw.Rev.Stat. § 11–216(a) (Michie 1998) (version effective June 30, 1999) (a complaint initiated by the CSC "shall be ... signed by chairperson"), *with* Haw.Rev.Stat. § 11–216(a) (Supp.2001) (a complaint initi-

ated by the CSC "shall be ... signed by the executive director").

**4.** Although The Harris 2000 Campaign Committee is named as a respondent in the administrative action, it is The Harris 2002 Campaign Committee (formed to support Harris' gubernatorial candidacy) that is a party in this action. Plaintiffs stated at the hearing that the 2002 committee would be responsible for any violations by the 2000 committee. While the committees differ in name, their principals and their organization are the same, and the 2002 committee serves as the successor to the 2000 committee.

(A) In the case of the candidate, to the candidate's own campaign; or

(B) In the case of a campaign treasurer or candidate's committee, to the campaign of the candidate, question, or issue with which they are directly associated. . . .

Haw.Rev.Stat. § 11–200(a)(1)(Supp.2001).

Section 11–206, also cited in Count I, applies to campaign contributions received by a candidate in excess of the voluntary spending limit for a particular campaign. Section 11–206 requires those funds to be reserved until after a general or special election and prohibits the use of excess funds for personal expenses. With certain exceptions, after a general or special election, these funds may be used for any fund-raising activity for: 1) any other politically related activity sponsored by the candidate, 2) any ordinary and necessary expense incurred in connection with the candidate's duties as a holder of an elected state or county office, or 3) various charitable organizations. *See* Haw.Rev.Stat. § 11–206 (1993 and 2001 Supp.).

Administrative Rule 2–14.1–16 generally requires a candidate and his committee to use campaign contributions to pay for necessary expenses that are predominantly and directly related to a candidate's campaign to influence the nomination or election of the candidate. *See* Haw. Admin. R. 2–14.1–16 (Jan. 25, 2002).

Having reviewed the provisions cited in Count I and the facts presented in support of Count I, the court notes that the record presently before the court may not support the allegation that Harris' meetings with the DNC lacked a direct relation to his mayoral campaign. However, as the court decides that it is without jurisdiction in this matter, the court need not decide what relation, if any, the expenses had to any campaign.

Count II of the Amended Administrative Complaint similarly alleges a violation of section 11–200(a)(1). Count II alleges that Harris, the Harris Campaign Committee, and/or Liu "received and expended no less than $100,250 for the specific purpose of contributing to the Democratic National Party *or* earmarking contributions for the national campaigns of Al Gore and Joseph Lieberman." Amended Administrative Complaint at 10 (emphasis added).

Although unclear from either the Amended Administrative Complaint or the parties' briefs, the parties at oral argument agreed that Harris contributed $100,250 to the DNC pursuant to a pledge he had made to the DNC that he would raise $100,000 for it. What is not stated in the Amended Administrative Complaint, but what Defendants agree, is that most of that money ($86,950) was collected in the form of checks made payable to the DNC, not to the Harris campaign. The Harris campaign apparently solicited and collected checks and then mailed them to the DNC. To make up the difference between the promised $100,000 and the $86,950 collected, the Harris Campaign Committee contributed an additional $13,300 to the DNC from Harris' campaign treasury. That is, the additional $13,300 came from contributions that had been made to Harris.

The reference in Count II to the possibility of contributions that were "earmarked" for Al Gore and Joseph Lieberman appears to be related to other provisions in section 11–200. Those other provisions state:

(2) [A candidate shall not receive any contributions or receive or make any transfer] [t]o support the campaigns of candidates other than the candidate for whom the funds were collected or with whom the campaign treasurer or candidate's committee is directly associated[.]

. . . .

(e) This section shall not be construed to prohibit a candidate from making contributions to the candidate's party so long as that contribution is not earmarked for another candidate.

Haw.Rev.Stat. §§ 11–200(a)(2) and (e) (Supp.2001).

In fact, there is no evidence before this court that funds were "earmarked" "for the national campaigns of Al Gore and Joseph Lieberman." *See* Haw.Rev.Stat. § 11–191 (defining "earmarked funds" as having a "condition that the funds be . . . expended on certain candidates, issues or questions"). Exhibit 3 to the Amended Administrative Complaint indicates only that checks "from businesses, labor organizations, and residents of Honolulu, Hawaii[,] totalling [sic] $100,250" were sent by Harris to the DNC to assist "the national coordinated campaign for the 2000 election."[5] *See* Letter from Jeremy Harris, Mayor, City & County of Honolulu, to Democratic National Committee (November 3, 2000) (attached to Amended Administrative Complaint as Ex. 3). Again, while the court questions whether, on the present record, all of the matters cited in Count II could be said to constitute violations of law, the court need not decide that here.

Count III of the Amended Administrative Complaint alleges that Harris, the Harris Campaign Committee, and/or Liu violated Haw.Rev.Stat. § 11–204(e) by "receiv[ing] in aggregate more than the applicable contribution limits from numerous contributors when Harris solicited $100,250 in contributions and failed to either transfer an amount equal to any excess to the Hawaii Election fund or return any excess contributions to the original donor and notify the Commission within thirty days of receipt of the contributions." *See* Amended Administrative Complaint at 10. Under section 11–204, contributions during an election period to a candidate seeking nomination or election are limited to $2,000 for two-year offices and $6,000 for four-year statewide offices. Haw.Rev. Stat. § 11–204(a) (Supp.2001). If these limits are exceeded, section 11–204(e) requires a transfer of an amount equal to the excess to the Hawaii election campaign fund or the return of the excess to the donor and notification to the CSC. *See* Haw.Rev.Stat. § 11–204(e) (Supp.2001). In response to questions by the court, Defendants' counsel explained at the hearing that Count III of the Amended Administrative Complaint was based on the premise that, by collecting checks made payable to the DNC, Harris was receiving campaign funds for his own campaign that should count against the dollar limits in section 11–204(a). While this explanation raises numerous questions, the court need not address those questions on the present motion.

Count IV of the Amended Administrative Complaint alleges that Harris, the Harris 2000 Campaign Committee, and/or Liu violated Haw.Rev.Stat. §§ 11–212 and 11–213 when they "actively solicited, re-

---

**5.** The CSC has issued Advisory Opinion No. 97–01, in which the CSC interprets Haw.Rev. Stat. § 11–200. That opinion recognizes that a candidate may contribute to the candidate's party so long as that contribution is not earmarked for another candidate. The opinion states that "[c]ampaign contributions received by a candidate for a state or local office cannot be transferred to a campaign for a federal office by the candidate . . . . [or] transferred to any other candidate for federal office." Advisory Opinion 97–01 (attached as Ex. 4 to Motion). Although, as explained by Defendants at the hearing, the Amended Administrative Complaint raises the concern that contributions to a candidate's political party might be allowed only if the party is a state or local entity, as opposed to a national party or committee such as the DNC, the advisory opinion does not speak to that issue. *See id.*

ceived and expended funds in the amount no less than $100,250 for the specific purpose of contributing to the Democratic National Committee or the campaign of Al Gore and Joseph Lieberman and failed to report these contributions and expenditures in his preliminary, final, or supplemental reports for the period of July 1, 2000 through December 31, 2000." Amended Administrative Complaint at 10–11. Sections 11–212 and 11–213 govern reporting requirements for campaign contributions. This count raises the same questions noted above with respect to other counts, but, again, the court need not address the merits of this matter.

Although Watada "initiated" the charges in issue here on behalf of the CSC, there is no evidence that the Commissioners expressly authorized him to file any of those charges. The minutes of the February 13, 2002, CSC meeting indicate that Watada, and not the Commissioners, brought the complaint before the CSC.[6] *See* Ex. B to Reply. Thus, notwithstanding any research or investigation Watada, as the Commissioner's staff member, may have conducted himself before filing the charges, it does not appear that the Commissioners, who are the administrative decision-makers, had had any chance to review the matter before Watada filed the initial charges.

Unfortunately, when the Commissioners were faced with the original administrative complaint, it did not contain a clear recitation of the facts underlying it. It did not,

for example, make clear that the majority of the campaign contributions being reviewed had been in the form of checks made payable to the DNC. *See* Ex. B to Reply. If this was brought to the Commissioners' attention (a matter that is not clear from the record before this court), it was apparently not until they met to address the administrative complaint on February 13, 2002. It is therefore not surprising to the court that the Commissioners decided to "further determine the legal issues." *Id.* at 2. Although Plaintiffs view this deferral as ominous, *see* Declaration of William C. McCorriston (February 25, 2002) ¶ 11, it is not at all clear from the present record that such a view is warranted. At the hearing on the present motion, Plaintiffs said that two Commissioners were ready to go forward with a finding that Plaintiffs had violated campaign spending laws. However, the evidence before this court indicates only that one of the Commissioners moved for a further investigation into the charges of the administrative complaint and that the motion was carried by a 3 to 2 vote. There is no evidence indicating exactly what the minority was advocating. *See* Declaration of William C. McCorriston (February 25, 2002) ¶ 11.

The Commissioners are scheduled to meet on April 17, 2002, to take up the matter of the Amended Administrative Complaint and Plaintiffs' response to it. *See* Declaration of Christopher I.L. Parsons (March 14, 2002) ¶ 4. At that meeting,

---

**6.** Watada apparently filed the administrative complaint in his official capacity, so that the administrative complaint does constitute state action. *See, e.g.,* Letters from Robert Y. Watada to Jeremy Harris (January 31, 2002, and March 15, 2002) (transmitting the administrative complaints on official CSC letterhead). This is not the same as saying that the Commissioners saw, approved, or in any way endorsed the filing of that administrative complaint. Instead, the administrative complaint

may have been filed for the purpose of placing matters before the Commissioners, so that Watada could no longer be said to be acting on his own in furtherance of an alleged "personal vendetta" against Plaintiffs. *See* Letter from Robert Y. Watada to Christopher I.L. Parsons (September 28, 2001) ("All subsequent communications will be addressed through an administrative complaint process").

the Commissioners could choose from a number of options. They might decide that additional investigation is warranted. They might instead summarily dismiss the complaint, make a preliminary determination, or refer the complaint to the appropriate prosecuting authority. If the CSC makes a preliminary determination that there is probable cause to believe that applicable laws have been violated, Plaintiffs will be afforded a contested case hearing if they desire one. *See* Haw.Rev.Stat. §§ 11–216(b) to (d) (Supp.2001); *See also* Declaration of Robert Y. Watada (March 7, 2002) ¶ 15 ("when the matter is brought back to the CSC and the CSC receives and considers any additional responses Harris and the Committees may submit, the CSC will again decide whether to dismiss the complaint, refer the matter for even more investigation, refer the matter to a prosecutor, or make a preliminary determination that there is probable cause to believe that there has been a violation ... and allow [the administrative complaint Defendants] to request a contested case hearing").

Harris says that he intends to continue "raising funds and soliciting support for the Democratic Party, including [the DNC], and federal election campaigns." Declaration of Jeremy Harris (February 25, 2002) ¶ 5. He says that the filing of the

administrative complaint by Watada has "impaired and threatened the readiness, willingness, and ability" to conduct these activities. *Id.* Harris has also stated that he is "ready, willing and able to authorize a substantial expenditure of funds as a contribution to [the DNC] from [his] campaign committee's account and to ask others to provide similar contributions to the DNC." Supplemental Declaration of Jeremy Harris (March 21, 2002) ¶ 3. He says that he is refraining from doing so because of the administrative complaint filed by Watada.[7] *Id.*

### 3. STANDARD OF REVIEW.

 A complaint may be dismissed for lack of subject matter jurisdiction either because the allegations of the complaint are insufficient to confer subject matter jurisdiction on the court, or because subject matter jurisdiction is lacking in fact. *Thornhill Publ'g Co. v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir.1979). When a dismissal is based on the insufficiency of the allegations of the complaint, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Federation of African Amer. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir.1996). When a court instead examines whether there is subject matter

---

7. A state court judge had ruled shortly before the hearing on the present motion that, under state law, Harris could not conduct a gubernatorial campaign without first resigning from his office as Mayor. Following that decision, the media reported that Harris had announced the suspension of all campaign activities, including raising and spending money on his gubernatorial campaign. *See* Kevin Dayton, *Harris Freezes Campaign*, Honolulu Advertiser (March 13, 2002) at A1 and A5. The day after the hearing that this court held, the press reported that Harris, through a spokesperson, had issued a statement allegedly indicating that Harris had changed his position and would accept campaign contri-

butions to avoid losing standing in a federal lawsuit his campaign had filed to challenge a complaint pending before the CSC. *See* Johnny Brannon & David Waite, *Harris Accepting Campaign Cash*, Honolulu Advertiser (March 26, 2002) at B3 and B6. As Harris has several federal lawsuits now pending, it is unclear whether this alleged statement was intended to refer to this particular lawsuit. Although the court does not in any way rely on these newspaper accounts, which the parties have had no opportunity to verify or challenge, the matters raised in the articles, if true, may be the subject of discussion should there be future proceedings in this case.

jurisdiction in fact, the court need not presume that the plaintiff's factual allegations are correct. The existence of disputed material facts will not preclude the trial court from evaluating for itself the existence of subject matter jurisdiction in fact. *Thornhill,* 594 F.2d at 733. The court here examines whether subject matter jurisdiction exists in fact.[8]

## 4. *ANALYSIS.*

The initial inquiry for the court is whether it has jurisdiction over the matters raised by Plaintiffs. Any jurisdictional inquiry begins with Article III, section 2, of the Constitution, which confines federal courts to deciding cases or controversies. To qualify for adjudication by a federal court, a plaintiff must show that an actual controversy exists at all stages of the case. *Arizonans for Official English v. Arizona,* 520 U.S. 43, 63, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). No case or controversy exists if a plaintiff lacks standing to make the claims asserted or if a dispute is not ripe. *See White v. Lee,* 227 F.3d 1214, 1242 (9th Cir.2000) (stating that standing pertains to a federal court's subject matter jurisdiction); *St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir.), *cert. denied,* 493 U.S. 993, 110 S.Ct. 541, 107 L.Ed.2d 539 (1989) (whether a claim is ripe for adjudication goes to a court's subject matter jurisdiction). As they are the parties invoking federal jurisdiction, Plaintiffs have the burden of establishing their entitlement to sue. *See San Diego County Gun Rights Comm. v. Reno,* 98 F.3d 1121, 1126 (9th Cir.1996).

To have standing to maintain a claim, a plaintiff must demonstrate: 1) an injury in fact—an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent, not conjectural or hypothetical; 2) a causal relationship between the injury and the challenged conduct—an injury that is fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and 3) a likelihood, not mere speculation, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Reno,* 98 F.3d at 1126.

The Ninth Circuit has recognized that, "in many cases, ripeness coincides squarely with standing's injury in fact prong." *Thomas v. Anchorage Equal Rights Comm'n,* 220 F.3d 1134, 1138 (9th Cir.2000) (en banc), *cert. denied,* 531 U.S. 1143, 121 S.Ct. 1078, 148 L.Ed.2d 955 (2001). Ripeness is determined by a two-pronged analysis. A plaintiff must show both that the issues are appropriate for judicial decision and that the parties will suffer hardship if judicial consideration is withheld. *Municipality of Anchorage v. United States,* 980 F.2d 1320, 1323 (9th Cir.1992).

Whether the court applies a ripeness or a standing analysis, the court must determine that there is a "case or controversy" that presents issues that are "definite and concrete, not hypothetical or abstract." *Thomas* at 1139. To assure that this jurisdictional prerequisite is satisfied, Plaintiffs must show that they face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99

**8.** Although Plaintiffs were given the opportunity to conduct discovery and then provide the court with live testimony in connection with their preliminary injunction motion, Plaintiffs chose to rely solely on their briefs and the declarations in support of their motion. The court's factual inquiry into jurisdiction is therefore limited to an examination of the papers filed by the parties.

S.Ct. 2301, 60 L.Ed.2d 895 (1979); *San Francisco County Democratic Central Comm. v. Eu*, 826 F.2d 814, 821 (9th Cir. 1987) (en banc), *aff'd*, 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). Plaintiffs claim that they face the danger that their First Amendment rights will be infringed by the CSC's application of state campaign spending laws to prohibit them from raising money for the DNC or contributing to the DNC.

 In a recent en banc decision, the Ninth Circuit recognized that "neither the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Thomas*, 220 F.3d at 1139. Rather, there must be a genuine threat of imminent prosecution. *Id.* In evaluating the genuineness of a claimed threat of prosecution, the Ninth Circuit examines three factors: 1) whether the plaintiffs have articulated a "concrete plan" to violate the law in question; 2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings; and 3) whether there is a history of past prosecution or enforcement under the challenged statute. *Id.*

 With respect to the first prong— whether the plaintiffs have articulated a "concrete plan" to violate the law in question—a general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete plan. *Thomas*, 220 F.3d at 1139. In *Reno*, for example, the Ninth Circuit held that plaintiffs do not face a genuine threat of prosecution when they merely assert that they "wish and intend" to engage in proscribed activities. *Reno*, 98 F.3d at 1127. Quoting *Lujan*, the Ninth Circuit stated that these "someday" intentions, without any description of concrete plans, or even any specification of when the "some day" will be, do not support a

finding of actual or imminent injury. *Reno*, 98 F.3d at 1127.

 With respect to the second prong—whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings—the threat of enforcement must at least be "credible," not simply imaginative or speculative. *Thomas*, 220 F.3d at 1140; *Eu*, 826 F.2d at 821. A plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief." *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301. Nor is a plaintiff "required to await and undergo a criminal prosecution as the sole means of seeking relief." *Id.* However, when a plaintiff does not claim that he or she has ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, that plaintiff does not allege a dispute susceptible to resolution by a federal court. *Id.*

With respect to the third prong—whether there is a history of past prosecution or enforcement under the challenged statute—there is no evidence that any of the statutes has ever been enforced in the manner Watada seeks to have them enforced in the administrative complaint. Although CSC has apparently referred for prosecution other matters involving Harris, these matters do not appear to involve similar facts and laws.

 Plaintiffs argue that their First Amendment rights are being chilled and that this chill, by itself, is sufficient to establish standing and a ripe controversy under the relaxed standards they say apply in First Amendment cases. The court agrees that the standing requirements are relaxed when, as here, First Amendment rights are implicated. In *Virginia v. American Booksellers Assoc.*, 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988), the Supreme Court noted that, in the First Amendment context, litigants are permit-

ted to challenge a statute, not because their own rights to free expression are violated, but because of "a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." The Court characterized the danger as being one of "self-censorship." *Id.* at 392–93, 108 S.Ct. 636. The Court therefore allowed a pre-enforcement suit to challenge an alleged infringement on the First Amendment rights of bookbuyers. *Id.*

*Virginia,* however, did not rule that every claimed violation of a person's First Amendment rights necessarily leads to standing to challenge a statute before it is enforced, as the Court based its determination of standing on an "actual and well-founded fear that the law will be enforced against them." *Id.* At the hearing before this court, Plaintiffs themselves cited *Bland v. Fessler,* 88 F.3d 729, 737 n. 11 (9th Cir.), *cert. denied,* 519 U.S. 1009, 117 S.Ct. 513, 136 L.Ed.2d 403 (1996), for the proposition that, at a minimum, they must have a "credible" fear that the law will be enforced against them. *See also Landell v. Sorrell,* 118 F.Supp.2d 459, 475 (D.Vt. 2000). *Accord New Hampshire Right to Life Pol. Action Comm. v. Gardner,* 99 F.3d 8, 14 (1st Cir.1996) ("if no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes. A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes

unless that fear is objectively reasonable"). It is this well-founded or credible fear that is lacking in the present case.

Plaintiffs point to the Amended Administrative Complaint filed by Watada, claiming that Watada's complaint, by itself, threatens their First Amendment rights.[9] In so arguing, Plaintiffs rely on case law indicating that a sufficient threat exists for purposes of the case or controversy requirement when the state attorney general states that he or she intends to enforce a statute or to encourage law enforcement to do so. *See, e.g., Culinary Workers Union, Local 226 v. Del Papa,* 200 F.3d 614, 618 (9th Cir.1999). Such case law is distinguishable. First, there is no evidence indicating that an administrative complaint filed with the CSC does anything except begin the process for determining whether a potential violation exists. Second, Plaintiffs have submitted no evidence or authority indicating that such an administrative complaint amounts to a threat of prosecution or makes such a prosecution likely when, as here, the administrative complaint is so unclear that one cannot determine whether the campaign spending laws even apply. The CSC's further investigation of the legal issues contained in the administrative complaint indicates that the CSC is merely in the process of evaluating that complaint.

The court realizes that, as Plaintiffs vigorously argue, the Supreme Court, in *Babbitt,* referred to the mere remote possibility of prosecution. That reference,

---

**9.** At the hearing, Plaintiffs argued that every administrative complaint, no matter how far-fetched, is a threat to a candidate's First Amendment rights. This argument makes a nullity of the requirement that the threat be credible, as it is foreseeable that someone may file a frivolous administrative complaint that in no way states any violation of campaign spending laws. In the present case, the administrative complaint is so unclear that

the Commissioners would be justified in being unable to determine whether it alleged facts sufficient to state a violation. For that reason, Plaintiffs' reliance on *New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1499 (10th Cir.1995), is misplaced. That case involved a challenge to a campaign spending law that was clearly applicable to the situation presented in that case.

however, was not an invitation to plaintiffs to assert standing based on the remote possibility of prosecution. Instead, in *Babbitt,* the Court, quoting *Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), said only that plaintiffs who did not claim that they had been threatened with prosecution or that prosecution was likely or even remotely possible did not have a right to be in federal court. That is a far cry from a statement that the mere possibility of prosecution would indeed have provided a basis for asserting federal court jurisdiction. As noted above, that reading would make a nullity of the "credible" threat requirement. While clearly the existence of an administrative complaint raises the remote possibility of prosecution, the court does not read *Babbitt* or any governing law as holding that a remote possibility is sufficient to establish standing.[10] Indeed, if a remote possibility were indeed sufficient, it is hard to see why there needs to be even an administrative complaint. An initial inquiry by Watada presumably would have satisfied that standard, and every passing inquiry by an administrative agency would then give rise to federal jurisdiction.

The court is similarly unpersuaded by Plaintiffs' argument that the failure of the Commissioners to "disavow" the charges in the Amended Administrative Complaint gives rise to a credible threat of prosecution. The Supreme Court has found a fear of prosecution to be "well-founded" when a state has "not suggested that the ... law would not be enforced." *Virginia,* 484 U.S. at 393, 108 S.Ct. 636. Examining this

language, the Ninth Circuit has recognized that the mere existence of a law may give rise to a well-founded fear. *See, e.g., Bland,* 88 F.3d at . In both *Virginia* and *Bland,* it appears that the states had opportunities to disavow the application of the laws in issue after examining the facts in light of the applicable laws.

In the present case, the CSC has not disavowed the application of the law to the present facts. This failure to disavow is not surprising, given the vagueness of the administrative complaint. The Commissioners have not had an opportunity to examine the actual facts and apply the campaign spending laws to those facts to determine whether the laws apply at all. The Commissioners voted to "further determine the legal issues" presented by Watada's administrative complaint. Watada then amended the administrative complaint, which the Commissioners are scheduled to review at their next meeting. Under these circumstances, the court cannot find a credible fear of prosecution based merely on the Commissioners' failure to disavow the charges as presented at their meeting on February 13, 2002. This is not to say that, if the Commissioners simply postpone action at their next meeting, the court will take the same view of a continued failure to disavow certain charges. The court can conceive of circumstances in which a failure to disavow will certainly be sufficient to create the necessary credible threat. Plaintiffs have simply not shown that they are now subject to such a credible threat.

---

**10.** The court recognizes that, in *Del Papa,* the Ninth Circuit quoted *Babbitt* as holding that an allegation that a prosecution is remotely possible is sufficient to establish a dispute susceptible to resolution by a federal court. *See Del Papa,* 200 F.3d at 618. However, that reading of *Babbitt* by the Ninth Circuit came in what was clearly dicta, as *Del Papa* in-

volved a specific threat of prosecution. *See Del Papa,* 200 F.3d at 618. Moreover, if *Del Papa* were read as holding that a remote possibility established standing, *Del Papa* would be at odds with other governing case law requiring that any threat be credible. *See, e.g., Babbitt,* 442 U.S. at 298, 99 S.Ct. 2301; *Bland,* 88 F.3d at 737 n. 11.

As Plaintiffs have not demonstrated a case or controversy for Article III purposes, the Complaint filed in this court is dismissed for lack of jurisdiction.[11]

### 5. CONCLUSION.

The Complaint is dismissed, and Plaintiffs' motion for preliminary injunction is denied as moot. As stated above, Plaintiffs are granted leave to amend their Complaint no later than April 30, 2002, if the Commissioners meet and decide to take any action other than dismissing Watada's complaint. If the Complaint is not so amended, the Clerk of the Court shall dismiss this action on or after May 1, 2002.

IT IS SO ORDERED.

11. This case is distinguishable from the situation recently addressed by Judge Helen Gillmor in another case involving Harris and his campaign. In *Smith v. State of Hawaii Campaign Spending Commission, et al.*, Civil No. 02–00068 HG–BMK, Judge Gillmor found that the plaintiffs had standing to challenge the CSC's actions given two advisory opinions issued by the CSC in which the CSC had announced its interpretation of the laws at issue in that case. In the present case, by contrast, there are no advisory opinions or other indications of how the CSC will apply the law to the facts raised so unclearly by the Amended Administrative Complaint.