**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

ASSOCIATION OF IRRITATED
RESIDENTS, a California non-profit
corporation,

*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY; GINA MCCARTHY, in her
official capacity as Administrator of
the U.S. Environmental Protection
Agency; JARED BLUMENFELD, in his
official capacity as Regional
Administrator for region IX of the
U.S. Environmental Protection
Agency,

*Respondents*,

FOSTER POULTRY FARMS; FOSTER
FARMS LLC; DAIRY CARES; SAN
JOAQUIN VALLEY UNIFIED AIR
POLLUTION CONTROL DISTRICT; AIR
COALITION TEAM,

*Respondents-Intervenors*.

No. 13-73398

OPINION

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted
February 10, 2015—San Francisco, California

Filed June 23, 2015

Before: Mary M. Schroeder,  Senior Circuit Judge, Barry
G. Silverman, Circuit Judge, and Marvin J. Garbis, Senior
District Judge.[*]

Opinion by Judge Garbis

## SUMMARY[**]

### Environmental Law

The panel denied a petition for review brought by the
Association of Irritated Residents seeking review of the
United States Environmental Protection Agency's
promulgation of 40 C.F.R. § 52.245 under § 110(k)(6) of
the Clean Air Act, an error-correcting provision, after the
EPA determined that it had mistakenly approved certain

---

[*] The Honorable Marvin J. Garbis, Senior United States District
Judge for the District of Maryland, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

New Source Review rules in 2004 as part of California's State Implementation Plan.

The panel held that the EPA was not arbitrary, nor did it abuse its discretion, in correcting the prior approval of the New Source Review rules after it learned that California law, California Senate Bill 700, did not authorize the San Joaquin Air Control District to require new source permits or emissions for minor agricultural sources. The panel further held that because those rules conflicted with state law, they should not have been incorporated into the State Implementation Plan, and the EPA did not act improperly in correcting its prior approval.

The panel held, as a matter of first impression, that the EPA reasonably interpreted § 110(k)(6) of the Clean Air Act to grant the EPA authority to amend retroactively its approval of the 2004 New Source Review rules.

---

## COUNSEL

Brent Newell (argued), Center on Race, Poverty & the Environment, Oakland, California; Sofia Parino, Center on Race, Poverty & the Environment, San Francisco, California, for Petitioners.

Robert Dreher, Acting Assistant Attorney General, and Simi Bhat (argued), Environmental Defense Section, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C.; Jefferson Wehling, United States Environmental Protection Agency, Region IX, Office of Regional Counsel, San Francisco, California; Scott Jordan, United States Environmental

Protection Headquarters, Office of General Counsel, Washington, D.C., for Respondents.

Philip M. Jay (argued), Rissa A. Stuart, and Ann M. Grottveit, Kahn, Soares & Conway, LLP, Sacramento, California, for Respondent-Intervenor Air Coalition Team.

David E. Cranston and Sedina L. Banks, Greenberg Glusker Fields Claman & Machtinger LLP, Los Angeles, California, for Respondent-Intervenor Dairy Cares.

Timothy S. Bishop (argued), Mayer Brown LLP, Chicago, Illinois; Carmine R. Zarlenga, Michael B. Kimberly, and Matthew A. Waring, Mayer Brown LLP, Washington, D.C., for Respondents-Intervenors Foster Farms, LLC and Foster Poultry Farms, Inc.

Catherine T. Redmond, Special Advisory Counsel, and Annette Ballatore-Williamson (argued), District Counsel, San Joaquin Valley Unified Air Pollution Control District, Fresno, California, for Respondent-Intervenor San Joaquin Valley Unified Air Pollution Control District.

## OPINION

GARBIS, District Judge:

Petitioner, Association of Irritated Residents ("AIR"), petitions this court for review of the United States Environmental Protection Agency's ("EPA") promulgation of 40 C.F.R. § 52.245, a regulation that revised the scope of a previous EPA decision. The EPA promulgated the regulation under § 110(k)(6) of the Clean Air Act ("CAA,"

"Act"), an error-correcting provision, after the Agency determined that it had mistakenly approved certain New Source Review rules in 2004 as part of California's State Implementation Plan.

This case requires the court to address two matters. First, this court must decide whether the EPA reasonably determined that it made the error. This court holds that the EPA was not arbitrary, nor did it abuse its discretion in correcting its prior approval of the New Source Review rules after it learned that California law, specifically Senate Bill 700, did not authorize the San Joaquin Air Control District to require new source permits or emissions offsets for minor agricultural sources. Because those rules conflicted with state law, they should not have been incorporated into the State Implementation Plan in 2004; thus, the EPA did not act improperly in correcting its prior approval.

Second, as a matter of first impression, this court must decide whether § 110(k)(6) of the CAA grants the EPA authority to amend retroactively its approval of the 2004 New Source Review rules. Petitioner argues that the other enumerated actions in § 110(k) strictly limit the EPA's methods of revising an error. Using the standard set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), we find that § 110(k)(6) does not clearly speak to the issue at hand. In light of this ambiguity, the EPA reasonably interpreted § 110(k)(6)'s requirement that the EPA "revise such [erroneous] action as appropriate" to encompass a retroactive limitation of its previous approval. Accordingly, we deny the petition for review.

## I.  Background

### A.  The Clean Air Act

Congress enacted the CAA amendments in 1970 "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).  At that time, Congress also created the EPA and charged it with setting National Ambient Air Quality Standards ("NAAQS") for various harmful air pollutants at levels necessary to protect the public health and welfare. 42 U.S.C. §§ 7408, 7409.  The EPA must designate areas for each NAAQS as attainment (it meets the EPA-set pollutant level), nonattainment (it does not meet the EPA-set pollutant level), or unclassifiable.    42 U.S.C. § 7407(d)(1).    The EPA is charged with assuring compliance    with    environmental    laws    and    taking enforcement action against violations.  *See* 42 U.S.C. § 7413(a), (b).

Under the CAA, the EPA works with the states pursuant to a model of cooperative federalism to achieve the statute's environmental goals.  *Vigil v. Leavitt*, 381 F.3d 826, 830 (9th Cir. 2004).  The Act delegates to the states "primary responsibility for assuring air quality" within their respective boundaries and requires each state to develop a State Implementation Plan ("SIP"), "which will specify the manner in which [the NAAQS] will be achieved and maintained." 42 U.S.C. § 7407(a).  In California's San Joaquin Valley, the San Joaquin Valley Unified Air Pollution Control District (the "District") promulgates and enforces regulations to meet the standards set by the EPA. A state submits its SIP to the EPA for review and approval whenever the NAAQS are updated.  42 U.S.C. § 7410(a). Once    an    adequate    SIP    (one    that    meets    the    Act's

requirements) is approved by the EPA, it has "the force and effect of federal law." *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007). The CAA requires states to give the EPA "necessary assurances" that state law authorizes the air control districts to carry out any rules contained in the SIP. 42 U.S.C. § 7410(a)(2)(E).

In 1977, Congress enacted the CAA's New Source Review ("NSR") program "to strengthen the safeguards that protect the nation's air quality." *New York v. EPA*, 413 F.3d 3, 10 (D.C. Cir. 2005). The NSR program requires new and modified major sources, [1] in non-attainment areas, to acquire construction permits, install Best Available Control Technology ("BACT"), and purchase offsets from other sources (emission reductions). 42 U.S.C. §§ 7502(c), 7503(a). A minor source is subject to the EPA regulations, although it is not required to have NSR permits for all construction activities. A minor source is not subject to offset requirements unless the state chooses to establish them as part of the SIP.

## B. California's Implementation of the Clean Air Act

California's Central Valley, which includes the San Joaquin Valley, has, and at all times relevant hereto, had, a major air pollution problem. In 2004, the EPA designated

---

[1] A major source is defined as a source that emits above a threshold level of any air pollutant. *See, e.g.*, 42 U.S.C. § 7511a(e) (designating a source as major when it has the potential to emit at least ten tons of volatile organic compounds a year). A minor source is one that is not major.

the San Joaquin Valley as a non-attainment area for the 8-hour ozone standard. *See* 69 Fed. Reg. 23,858, 23,889 (Apr. 30, 2004).

Ground-level ozone (aka smog) forms when volatile organic compounds ("VOCs") react with nitrogen oxides in the presence of heat and sunlight during the summer. Ozone pollution causes serious health problems, including damaging lung tissue and exacerbating asthma and other respiratory diseases. 69 Fed. Reg. at 23,859–60.

The District estimated that, even with air pollution controls, confined animal facilities were among the largest sources of VOCs in the Valley. Nevertheless, California's former California Health & Safety Code § 42310(e) exempted agricultural operations, including those that would be considered major sources under the CAA, from the NSR permit obligations until 2003. Due to this blanket exemption, the EPA would not accept the District's proposed NSR Rules to the SIP because California could not "give necessary assurances" that it had authority under state law to carry out the SIP. *See* 68 Fed. Reg. 37,746, 37,747 (June 25, 2003).

In order to avoid sanctions and loss of federal highway funding, the California legislature passed Senate Bill 700 ("SB 700") in September 2003, which removed the blanket exemption that had previously excused all agricultural sources from the CAA's NSR requirements. California state law then required major agricultural sources to meet the pollution controls required by the CAA and the proposed NSR Rules. However, SB 700 retained narrow

exemptions[2] that excused certain minor agricultural sources from NSR permitting and offset requirements.

Around this same time, the EPA considered District Rules 2020 and 2201 (the "2004 NSR Rules"), which the District had submitted in 2002 to the EPA for approval. The 2004 NSR Rules required new source permits and offset requirements for all new and modified stationary sources of air pollution, whether major or minor. *See* 68 Fed. Reg. 7,330, 7,331 (Feb. 13, 2003). In evaluating the 2004 NSR Rules, the EPA failed to realize that the Rules conflicted with SB 700, which continued to exempt certain minor agricultural sources. The EPA approved the 2004 NSR Rules – sans exemptions for minor agricultural sources – which became effective on June 16, 2004. *See* 69 Fed. Reg. 27,837 (May 17, 2004).

Beginning in 2005, AIR filed three citizen suits[3] in the Eastern District of California against dairy farms that were minor agricultural sources under the CAA. *See Assoc. of Irritated Residents v. C & R Vanderham Dairy*, No. 05-01593 (E.D. Cal. Dec. 15, 2005) ("*Vanderham*"); *Assoc. of Irritated Residents v. Fred Schakel Dairy*, No. 05-00707 (E.D. Cal. June 1, 2005); *Assoc. of Irritated Residents v. Foster Farms, LLC*, No. 06-01648 (E.D. Cal. Nov. 15, 2006). AIR alleged that the dairies violated the 2004 NSR Rules by not obtaining a permit, purchasing offsets, or

---

[2] Cal. Health & Safety Code § 42301.18(c) ("Offset Provision"). *See also* Cal. Health & Safety Code § 39011.5(b) ,(c) ("Savings Clauses").

[3] An approved SIP may be enforced by citizens in federal court as well as by the EPA. 42 U.S.C. § 7604(a).

installing BACT. *See, e.g.*, *Vanderham*, 2007 WL 2815038, at \*1 (E.D. Cal. Sept. 25, 2007). In *Vanderham*, the district court granted summary judgment in favor of AIR and held that the defendants violated the 2004 NSR Rules. *Id.* at \*29.

## C.  The EPA's Error

After the *Vanderham* decision, the EPA realized that it had made an error in approving the 2004 NSR Rules, because the District did not have authority under SB 700 to enforce the permit and offset provisions of those Rules against certain minor agricultural sources. Specifically, the EPA found that the District did not have authority under SB700 "to require permits for new or modified minor agricultural sources with actual emissions less than 50 percent of the major source threshold or to require new minor agricultural sources or minor modifications to agricultural sources to obtain emission reduction offsets." *See* 78 Fed. Reg. 46,504, 46,505-06 (Aug. 1, 2013); Cal. Health & Safety Code §§ 42301.16, 42301.18(c). However, the CAA requires SIP revisions to be supported by necessary assurances from the State that the District will have adequate authority under State law to carry out the revised SIP. *See* 78 Fed. Reg. at 46, 511; 42 U.S.C. § 7410(a)(2)(E).

In 2008 and 2009, California submitted SIP revisions to amend the 2004 NSR Rules to include the state law exemptions. In 2010, the EPA proposed a rule that would modify its 2004 approval and correct the mismatch between state law and the SIP. *See* 75 Fed. Reg. 4,745 (Jan. 29, 2010). The new 2010 NSR Rules, complete with the state exemptions, replaced the 2004 NSR Rules and were incorporated into the SIP. *See* 75 Fed. Reg. 26,102 (May 11, 2010). However, this fix was only prospective and did

not eliminate the mismatch between the SIP and state law that existed from 2004 to 2010.

To correct this error retroactively, the EPA relied on § 110(k)(6) of the CAA which states:

> Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), . . . was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

42 U.S.C. § 7410(k)(6). Specifically, the EPA proposed correcting its error by amending its previous approval of the 2004 NSR Rules so that the approval was limited to be consistent with state law. 78 Fed. Reg. at 46,506. The EPA considered a retroactive limited approval to be the most appropriate response because it was a "narrowly tailored" approach that retained most of the pollution control aspects of the 2004 NSR Rules but still remedied the mismatch between the SIP and state law. *See* 78 Fed. Reg. at 46,511. In light of this proposed action, the district court stayed the *Vanderham* and other citizen suits cases pending judicial review of the EPA's final action. *See Vanderham*, 2008 WL 678590, at *2 (E.D. Cal. Mar. 11, 2008); *Fred Schakel Dairy*, 634 F. Supp. 2d 1081, 1096 (E.D. Cal. 2008); *Foster Farms*, 06-1648, Minute Order (E.D. Cal. Aug. 13, 2013) (No. 66).

Before the EPA finalized its error correction in 2013, it requested the California Attorney General to interpret SB 700 and its bearing on the District's authority to require permits and offsets from minor agricultural sources. In two letters, the Attorney General confirmed the EPA's view that SB 700 did not give the District authority to apply the 2004 NSR Rules to certain minor agricultural sources or require offsets.

The EPA then revised the scope of its 2004 approval, 78 Fed. Reg. at 46,511, and promulgated the final rule limiting its 2004 approval to cover only the air pollution controls allowed by state law. *See* 40 C.F.R. § 52.245. The new regulation states:

> (a) Approval of the [2004] New Source Review rules for the San Joaquin Valley Unified Air Pollution Control District Rules 2020 and 2201 as approved on May 17, 2004 in § 52.220(c)(311)(i)(B)(1), and in effect for Federal purposes from June 16, 2004 through June 10, 2010, is limited, as it relates to agricultural sources, to the extent that the permit requirements apply:
>
> > (1) To agricultural sources with potential emissions at or above a major source applicability threshold; and
> >
> > (2) To agricultural sources with actual emissions at or above 50 percent of a major source applicability threshold.
>
> (b) Approval of the [2004] New Source Review rules . . . is limited, as it relates to agricultural sources, to the extent that the

> emission offset requirements apply to major
> agricultural sources and major modifications
> of such sources.

40 C.F.R. § 52.245.  The error correction was in the form of notice-and-comment rulemaking, the same procedure the EPA had used to approve the 2004 rules.

### D.  The Instant Lawsuit

AIR challenges the EPA's promulgation of 40 C.F.R. § 52.245, the regulation that corrected the EPA's approval of the 2004 NSR rules, on two grounds.  First, AIR claims that § 110(k)(6) of the CAA authorizes the EPA to correct only its own erroneous approval or disapproval and does not give the EPA authority retroactively to limit or amend a SIP.  Second, AIR asserts that even if the EPA has authority retroactively to revise its approval of the 2004 SIP, it did not need to correct the approval because (a) the plain meaning of SB 700 does not exempt minor agricultural sources from obtaining permits and offsets under the District Rules and (b) the Savings Clauses grant the District with the authority to regulate minor agricultural sources regardless of the other provisions.  AIR requests that this court vacate 40 C.F.R. § 52.245.  The following Intervenors, representing various agricultural interests, organizations and an air pollution control district, appear on the EPA's behalf: Air Coalition Team ("ACT"), Dairy Cares, Foster Farms, LLC, Foster Poultry Farms, and San Joaquin Valley Unified Air Pollution Control District.

Petitioner filed a petition for review of the EPA's promulgation of 40 C.F.R. § 52.245 in this court on September 27, 2013.  This court has jurisdiction under the CAA § 307(b)(1), 42 U.S.C. § 7607(b)(1).[4]

## II.  Discussion

### A.  Standard of Review

The CAA does not specify a standard of review of the EPA actions.  Therefore, this court reviews the EPA's action under the standard set forth in the Administrative Procedure Act ("APA").  *Sierra Club v. EPA*, 671 F.3d 955, 961 (9th Cir. 2012).

Section 706 of the APA provides that a court may reverse an agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

---

[4] Intervenors ACT and Foster Farms contend that AIR's individual members do not have standing because (a) their injuries are not "fairly traceable" to the EPA's action and (b) vacating the EPA's finalized error correction will not redress their injuries.  This court finds that both causation and redressability are established for purposes of this suit and thereby rejects the Intervenors' challenge. In light of studies which show that dairy and poultry facilities greatly contribute to the amount of VOCs in the Valley, it stands that AIR's members' injuries are enhanced by the EPA's rule, which retroactively lessens the controls on pollution-emitting agricultural sources.  Also, were it not for the EPA's proposed correction, AIR would have been able to continue with its citizen suits enforcing the 2004 NSR Rules. Therefore, this court concludes that the Petitioners have standing to challenge the EPA's promulgation of 40 C.F.R. § 52.245. *See, e.g.*, *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1072 (9th Cir. 2014); *Sierra Club v. EPA*, 762 F.3d 971, 977 (9th Cir. 2014).

law."  5 U.S.C. § 706(2)(A).  When applying this standard, the court does not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S.*, *Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Nw. Ecosystem Alliance v. United States Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007).  Instead, this court "consider[s] whether the decision was based on a consideration of the relevant factors," *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971), and whether the agency articulated a "rational connection between the facts found and the choice made," *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962).

When reviewing the EPA's interpretation of § 110(k)(6) of the CAA, this court applies the two-step analysis provided in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).  First, the court must decide whether Congress has unambiguously and "directly spoken to the precise question at issue." *Id.* at 842.  If so, this court will give effect to the congressional intent expressed in the statute. *Id.* at 842–43.  To discover "the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).  If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.   "EPA's interpretation of its own regulations is given considerable deference and 'must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Comm. for a Better Arvin v. EPA*, — F.3d —, No. 11-73924, 2015 WL 2384556, at *3 (9th Cir. May 20, 2015)

(quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

## B.  The EPA's Error Determination

We begin our inquiry by determining whether the EPA made an error that needed to be corrected.  We ask whether the EPA acted arbitrarily or capriciously, abused its discretion, or contradicted the CAA when it decided there was a mismatch between state law and the SIP.  *See* 5 U.S.C. § 706(2)(A).  According to AIR, the District *did* have authority under state law to carry out the 2004 SIP, thus there was no mistake.  The parties' disagreement arises out of conflicting interpretations of SB 700's Offset Provision and Savings Clauses.

In reviewing agency action pursuant to § 706:

> Although we presume regulations to be valid, our inquiry into their validity is a "thorough, probing, in-depth review."
>
> . . .
>
> To determine whether the agency action was arbitrary and capricious, we must decide whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." An agency action must be reversed when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

> implausible that it could not be ascribed to a difference in view or the product of agency expertise." Our review of an agency decision is based on the administrative record and the basis for the agency's decision must come from the record. We cannot substitute our judgment for that of the agency.

*Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003) (internal citations omitted). Thus, the court will uphold the EPA's action as long as the EPA employed a rational, non-arbitrary process to determine if it had made an error.

At the outset, we note that while our court is not required to defer to the Attorney General, it need not interpret SB 700 for itself as long as it determines that the EPA did not clearly go against the plain meaning of the statute.[5] The pertinent provisions of SB 700 are

---

[5] ACT and the San Joaquin Valley District challenge this court's jurisdiction under 42 U.S.C. § 7607(b)(1) to hear AIR's claims involving the District's, CARB's, and the Attorney General's interpretation of SB 700. They claim that these types of challenges are suited for a state forum and go beyond the scope of jurisdiction granted in the CAA § 307. To the contrary, Congress granted this court broad jurisdiction to hear challenges to "any other final action of the Administrator," 42 U.S.C. § 7607(b)(1), which encompasses issues of state law involved in the EPA's action. AIR is not required to exhaust state law remedies before it can petition this court for review of the EPA action.

ambiguous, and both the EPA and AIR provide permissible interpretations.    In light of this ambiguity, it was appropriate and reasonable for the EPA to rely on the interpretations of the Attorney General and the California Air Resources Board ("CARB") in its determination that SB 700 provided certain exemptions that were not accounted for in the 2004 NSR Rules.  The EPA made a "rational connection" between the state officials' interpretations, the purposes of the CAA, and the choice it made.  *See Burlington Truck Lines,* 371 U.S. at 168.

The EPA insists that it made an error in its 2004 approval because there was a substantive mismatch between the 2004 NSR Rules and state law, meaning that the EPA had failed to get the "necessary assurances" that the District had adequate "authority under State . . . law to carry out" the SIP.  *See* 42 U.S.C. § 7410(a)(2)(E); *see generally* 78 Fed. Reg. 46,504 (Aug. 1, 2013).  Both the EPA and AIR offer logical readings of the SB 700 provisions at issue: the so-called Offset Provision and Savings Clauses.  Because there is more than one plausible explanation, the wording of the statute is ambiguous.  The EPA gave adequate consideration to the relevant factors, including the Attorney General's interpretation, and arrived at a rational conclusion on SB 700's meaning; therefore, the EPA's error determination was not arbitrary or capricious.

---

Even so, because we conclude that the EPA considered the relevant factors and had a reasoned basis for concluding that SB 700 conflicted with the 2004 NSR Rules, there is no need for us to go further and substantively interpret SB 700 for ourselves.

*1. Interpretation of the Offset Provision*

SB 700's Offset Provision states:

> A district may not require an agricultural source to obtain emissions offsets for criteria pollutants for that source if emissions reductions from that source would not meet the criteria for real, permanent, quantifiable, and enforceable emission reductions.

Cal. Health & Safety Code § 42301.18(c).

According to the EPA, the Offset Provision exempts minor agricultural sources from the emission offsets requirement because minor agricultural sources did not meet the statutory criteria during the time period that the 2004 NSR Rules were in effect. *See* 75 Fed. Reg. 4,745, 4,748 (Jan. 29, 2010). The minor sources did not meet the criteria because, according to the EPA, the Attorney General, and CARB, the words "real, permanent, quantifiable, and enforceable emission reductions" referred to the criteria for *offset credit* under the CAA. *See* 40 C.F.R. § 51.165(a)(3)(ii)(C)(1)(i) (to qualify for offset credit, emissions reductions must be "surplus, permanent, quantifiable, and federally enforceable"). Since minor agricultural sources were not determined to meet these criteria and were not eligible to receive offset credit for, or bank, their emission reductions, they were not required to purchase emissions offsets as an equitable matter. 78 Fed. Reg. at 46,510. This led the EPA to conclude that the Offset Provision did not grant the same authority to the District as the exemption-free 2004 NSR Rules did.

According to AIR, the plain meaning of the Offset Provision's criteria requires agricultural sources to obtain

offsets when their emission reductions are *SIP creditable*, not offset creditable.  To support this contention, AIR compares the words of the Offset Provision to the CAA's criteria for SIP credibility in the General Preamble for the Implementation of Title I of the CAA.  *See* 57 Fed. Reg. 13,498, 13,567–68 (Apr. 16, 1992) (suggesting principles for a SIP strategy that includes "quantifiable" emissions, "enforceable" measures, "replicable" measures, and an "accountable" control strategy).  AIR then argues that since the EPA has approved SIP credit for emissions reductions by several types of minor agricultural sources, those minor agricultural sources meet the criteria of SB 700's Offset Provision and are thus compatible with the 2004 District NSR Rules.

Because the listed criteria in the Offset Provision do not correspond precisely with either the requirements of SIP credibility or offset credibility, it is reasonable to interpret the provision as requiring either one or even both.  Since the statute is ambiguous, as long as the EPA provides a plausible and rational explanation for why it chose interpretation *X* over interpretation *Y*, then the court must uphold the EPA's decision.  *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.").

In reaching its final rule, the EPA spent several years considering the issue of the interpretation of SB 700, issued multiple notices, and accepted and responded to several comments, but the EPA's main source of support for its decision was the Attorney General's and CARB's letters interpreting the pertinent provisions of SB 700 in regard to minor agricultural sources.  78 Fed. Reg. at 46,506, 46,509–10.  Since the statute is ambiguous and technical, it

was rational for the EPA to request and accept the Attorney General's interpretation, especially since commenters, including AIR, had requested that the EPA obtain the Attorney General's input. *See* 78 Fed. Reg. at 46,506. The Attorney General's second letter in March 2013, which specifically addressed the application of the Offset Provision to minor agricultural sources, stated that these minor sources did not currently meet the criteria for "real, permanent, quantifiable and enforceable emission reductions," so the statute "suspend[s] the duty of a minor agricultural source to offset emissions from that source." Letter from Robert W. Byrne, Cal. Acting Sr. Asst. Attny. Gen. to Jared Blumenfeld, EPA Regional Administrator, 1 (March 18, 2013). The letter stated that this position was consistent with a CARB letter written in 2008. *Id.* at 2.

The 2008 CARB letter is the source of the EPA's argument that the Offset Provision's "criteria" refer to offset credit, not just SIP credit, as AIR argues. Specifically the letter stated:

> This limited exemption from the offset requirement means that agricultural sources that are not amenable to District prohibitory rules or control measures that would *qualify for SIP credit—or that are unable to generate emission reductions that would qualify as offsets*—because they fail to meet one or more of the basic criteria *for a creditable rule or for offset credit* cannot be required to provide offsets.

Letter from James Goldstene, Exec. Officer, CARB to Air Pollution Control Officers, 4 (Sept. 3, 2008) (emphasis added). This interpretation reveals that the Offset Provision's criteria refer to both SIP creditability and offset

creditability.   The EPA addressed this reading in its final rule:

> [T]he use of the conjunction "or" by CARB in its discussion of [the Offset Provision] . . . means that, under CARB's interpretation, even if SIP credit were approved for prohibitory rules or control measures, new or modified minor agricultural sources could not be required to provide emission offsets if they are unable to generate emission reductions that would qualify as offsets.

78 Fed. Reg. at 46,510.

AIR argues that since the EPA had already approved SIP credit for emissions reductions by agricultural sources, it was arbitrary and capricious for the EPA to say those sources do not meet the criteria under the Offset Provision. AIR's argument misses the point.   Because the EPA understands that the Offset Provision refers to both SIP-credit *and* offset-credit requirements, it does not matter that the EPA approved some minor agricultural sources for SIP credit because those sources still do not meet the requirements for offset credit.   According to the EPA, none of the sources mentioned by AIR receive offset credit for the emission reductions required by the SIP.   Therefore, the EPA was not arbitrary or capricious in determining that the District lacked the power under state law to require offsets from minor agricultural sources from 2004–2010.

AIR argues that this court should not defer to the California Attorney General's interpretation of SB 700, nor to CARB's interpretation of the Offset Provision.   If it were clear from the plain meaning of the statute that the EPA's interpretation was erroneous or unreasonable, then it may

well have been erroneous for the EPA to defer to a clearly wrong interpretation by the Attorney General. However, that is not the situation presented by the instant case.

AIR seeks to rely on two decisions of this court, which AIR states hold that this court does not have to defer to an Attorney General's opinion on state law. *See Maldonado v. Harris*, 370 F.3d 945, 954 n. 5 (9th Cir. 2004); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 395, *certified question answered sub nom. Com. v. Am. Booksellers Ass'n, Inc.*, 372 S.E. 2d 618 (Va. 1988). However, both decisions concerned facial constitutional challenges to state statutes that necessitated direct judicial review of the statute, whereas the present case involves judicial review of an agency's use of the California Attorney General's and CARB's informal interpretation of a state statute. *See Maldonado*, 370 F.3d at 948 (involving First Amendment challenge to California Outdoor Advertising Act); *Am. Booksellers Ass'n, Inc.*, 484 U.S. at 386 (interpreting the scope of a Virginia statute prohibiting display of explicit material in certain situations). Moreover, although the court is not bound by the California Attorney General's opinion, the EPA may properly find an Attorney General's interpretation reasonable and persuasive.

Other circuits have applied the arbitrary and capricious standard to the EPA's reliance on an Attorney General's or agency's interpretation of an ambiguous state law. In *Ohio Envtl. Council v. EPA*, the Sixth Circuit held that the EPA's reliance on the Ohio Attorney General's interpretation of Ohio law was not arbitrary and capricious, particularly because the petitioner did not take its challenge to the Ohio state courts prior to the action. *See* 593 F.2d 24, 29 (6th Cir. 1979). The Sixth Circuit also held that the EPA's determination based on the Attorney General's opinion was

"clearly consistent with its secondary role" in forming SIPs under the CAA. *Id.*

Similarly, in *Defenders of Wildlife v. EPA*, the Tenth Circuit addressed the EPA's reliance on a letter from New Mexico's Water Quality Control Commission ("WQCC") when interpreting an ambiguous New Mexico state regulation. 415 F.3d 1121, 1127–28 (10th Cir. 2005). The EPA based its approval of the regulation on WQCC's interpretation. The Tenth Circuit held that the EPA was not arbitrary or capricious in doing so. *See id.* at 1128 ("[T]he EPA did not act arbitrarily and capriciously in approving the regulation, particularly since the agency reserved the right to revoke approval if New Mexico interpreted the regulation in the future in a way that would not comply with the [Clean Water Act].").

In the instant case, the EPA's reliance on the Attorney General's and CARB's letters to interpret the ambiguous provisions of SB 700 was not arbitrary, capricious, or unlawful.

### 2. Interpretation of the Savings Clauses

The EPA and AIR interpret the Savings Clauses in SB 700 differently and disagree on whether there was an error or mismatch that the EPA needed to correct. The Savings Clauses provisions state:

> Any district rule or regulation affecting stationary sources on agricultural operations adopted on or before January 1, 2004, is applicable to an agricultural source.

Cal. Health & Safety Code § 39011.5(b).

> Nothing in this section limits the authority of a district to regulate a source, including, but not limited to, a stationary source that is an agricultural source, over which it otherwise has jurisdiction pursuant to this division, or pursuant to the federal Clean Air Act . . . or any rules or regulations adopted pursuant to that act that were in effect on or before January 1, 2003 . . . .

Cal. Health & Safety Code § 39011.5(c).

According to AIR, the Savings Clauses provisions preserve the District's authority to apply the 2004 District NSR Rules (adopted prior to January 1, 2004) to certain minor agricultural sources regardless of the meaning of the Offset Provision. AIR refers to the broad language of the Clauses and asks that the court adhere to their plain meaning.

The EPA proposes a more limited interpretation, contending that the provisions in the Savings Clauses do not override the provisions of SB 700 that exempt minor agricultural sources from air pollution controls. Nor, according to the EPA, do the Savings Clauses authorize the District's 2004 NSR Rules. Instead they only serve to preserve the District's authority to regulate sources that hadn't previously been, but were now considered "agricultural" because of SB 700's new definition[6] for

---

[6] The prior definition of agricultural source was "equipment used in agricultural operations in the *growing* of crops or the raising of fowl or animals." Cal. Health & Safety Code § 42310(e) (1989) (emphasis

agricultural sources.[7]   Moreover, section 39011.5(c) does
not grant authority to enforce the 2004 NSR Rules.  Even
though the definitional section of SB 700 did not limit the
District's authority, other sections, such as the Offset
Provision, might.

As was the case with the Offset Provision, the EPA's
determination that the Savings Clauses did not give the
District overriding authority to enforce the 2004 NSR Rules
was  based  on  the  California  Attorney  General's
interpretation in the 2012 letter.  78 Fed. Reg. at 46,508.
The Attorney General stated that the Savings Clauses "do
not authorize the Rules' permit and offset requirements"
because they were meant to be read in light of the
definitional context of section 39011.5.  Letter from Robert
W. Byrne, Cal. Acting Sr. Asst. Attny. Gen. to Jared
Blumenfeld, EPA Regional Administrator, 4 (November
14, 2012).

Before the legislature passed SB 700, California law
had provided an exemption to agricultural sources from all

---

added). The definition included in SB 700 is a source "used in the
*production* of crops, or the raising of fowl or animals located on
contiguous property under common ownership or control" that is a
"confined animal facility" or an "internal combustion engine" or a
CAA Title V source. Cal. Health & Safety Code § 39011.5(a)
(emphasis added).

[7] The Attorney General gives the example of production equipment,
such as a stationary diesel engine, that would not have been considered
an agricultural source before SB 700, but were regulated by the
District. *See* Letter from Robert W. Byrne, Cal. Acting Sr. Asst. Attny.
Gen. to Jared Blumenfeld, EPA Regional Administrator, 4 (November
14, 2012).

New Source Review permitting requirements, but districts were allowed to adopt non-New Source Review emission rules of general application that applied to agricultural stationary sources. *Id.* Section 39011.5(b) was meant to preserve *those* rules only—not NSR rules. *Id.* The purpose was to "preserve[] and validate[] those existing equipment-governing regulations of general application that, without such a savings clause, might be construed as invalid because the regulated equipment was included as part of SB 700's 'agricultural sources' [definition]." *Id.* This explanation is reasonable. If not limited to rule preservation, section 39011.5(b) would be granting districts *new* authority to apply NSR rules — authority that had previously not existed under California's blanket exemption.

The Attorney General also interpreted section 39011.5(c). *Id.* "[S]ubdivision (c) clarifies that section 39011.5 itself does not limit a district's existing authority, but subdivision (c) does not concern whether some other provision of SB 700 might limit a district's authority." *Id.* This explanation accounts for the statute as a whole. If the legislature intended for the Savings Clauses to allow the District to ignore the exemptions located elsewhere in SB 700, then it would have said that a district's prior authority was not limited by *any* section in the statute. For the same reasons set forth above regarding the Offset Provision, the court finds that the EPA reasonably relied on this interpretation from the Attorney General and was not arbitrary or capricious in deciding that it had made an error because it fully considered the effect of the Savings Clauses on the District's authority under state law.

### 3. The EPA Reasonably Respected State Law

The EPA's desire to correct its 2004 approval to make it align with state law is not an arbitrary one, considering the aims and structure of the CAA's model of cooperative federalism. The CAA grants primary authority to the states to develop emission limits. *Train v. Natural Res. Def. Council*, 421 U.S. 60, 79 (1975). The EPA's role under the CAA's scheme is secondary. *Id.* Therefore, by trying to respect California's statutory limits on air pollution controls, the EPA is properly considering the purpose and structure of the Act it is entrusted to enforce.

Before SB 700 was enacted, California's law included a blanket exemption for all agricultural sources, both major and minor, from the NSR air pollution controls. *See* 75 Fed. Reg. 4745, 4747 (Jan. 29, 2010). This legislative background indicates that California may have wished to preserve some form of agricultural exemption in its laws and intended for that exemption to carry into the SIP. Therefore, the EPA's interpretation of SB 700 and its decision to correct its 2004 approval were reasonable and pass arbitrary and capricious review.

In sum, this court holds that the EPA reasonably determined that California's SB700 was inconsistent with the 2004 NSR rules. It was appropriate and reasonable for the EPA to rely on the interpretations of the Attorney General and CARB when determining that the ambiguous California law provided certain exemptions that were not

accounted for in the 2004 NSR Rules.[8]  The EPA made a "rational connection" between the Attorney General's and CARB's interpretations, the purposes of the CAA, and the choice it made. *Burlington Truck Lines,* 371 U.S. at 168.

## C. The EPA's Authority Under § 110(k)(6) of the Clean Air Act

Concluding that the EPA reasonably decided it made an error that needed revising, we now address whether the EPA had the statutory authority to correct the error in the way that it did.  Whether § 110(k)(6) of the CAA gives the EPA authority to retroactively revise the scope of an earlier approval of a state's NSR Rules presents a question of first impression.

The Eleventh Circuit has previously considered the EPA action taken under § 110(k)(6), but it did not interpret the meaning of the provisions in question. *Alabama Envtl. Council v. Adm'r*, *EPA*, 711 F.3d 1277, 1289–90 (11th Cir. 2013) (determining that the EPA had not made an error determination as required by the Act).

---

[8] AIR argues that even if the 2004 NSR Rules conflict with SB700, that conflict does not matter because once the 2004 NSR Rules were approved by the EPA in 2004, they became federal law trumping any inconsistent state law.  It is true that when the EPA approves a SIP, it becomes federal law. *See Safe Air for Everyone*, 488 F.3d at 1097. But, AIR's argument fails to address the relevant time period.  The error at issue in this case is the EPA's apparent failure to recognize that the 2004 NSR Rules conflicted with SB700 prior to the EPA's issuing its May 2004 final approval of the Rules. *See* 78 Fed. Reg. at 46,505-06.  At that point in time, the 2004 NSR Rules had not yet been approved, and, thus, were not yet federal law.

Section 110(k)(6) reads:

> Whenever the [EPA] determines that [its] action approving, disapproving, or promulgating any plan . . . was in error, the [EPA] may *in the same manner* as the approval, disapproval, or promulgation *revise such action as appropriate* without requiring further submissions from the State. Such determination and the basis thereof shall be provided to the State and public.

42 U.S.C. § 7410(k)(6) (emphasis added).

This broad provision was enacted to provide the EPA with an avenue to correct its own erroneous actions and grant the EPA the discretion to decide when to act pursuant to the provision. *See Alabama Envtl. Council*, 711 F.3d at 1287 ("Through the use of the terms 'whenever' and 'may,' Section 110(k)(6) confers discretion on the EPA to decide if and when it will invoke the statute to revise a prior action."); *see also* 75 Fed. Reg. 82,536, 82,543 (Dec. 30, 2010) (discussing Congress' implementation of § 110(k)(6) to overturn a Third Circuit decision that held that the EPA's inherent authority to correct errors was narrow and could be used only to correct typographical errors, suggesting that Congress intended to grant the EPA broad authority to revise an error).

Pursuant to the statute, to correct an error, the EPA must first determine that it, in fact, made an error. 42 U.S.C. § 7410(k)(6). The EPA clearly articulated its alleged error and the basis thereof in the Federal Register and even received and replied to comments on the matter. *See, e.g.*, 78 Fed. Reg. at 46511. The EPA determined that it erred because it approved the 2004 NSR Rules even

though it did not receive "necessary assurances" that California had authority to carry out the Rules as mandated by the CAA.  *See* 42 U.S.C. § 7410(a)(2)(E).  Therefore, this court concludes that the error determination requirement was met.

Having determined that it erred, the EPA is required by § 110(k)(6)  to "revise such action" (1) "in the same manner as the approval, disapproval, or promulgation," and (2) "as appropriate without requiring further submissions from the State." 42 U.S.C. § 7410(k)(6).

### 1.  Interpretation of "in the same manner"

#### a.  Chevron Step One

Under *Chevron*, the court must first look at the statutory language of § 110(k)(6) to determine whether Congress clearly designated "in the same manner" to be a *procedural* requirement.  That is, whether the EPA must revise its action by employing the same APA or CAA procedures used in the original rulemaking.  *See* 78 Fed. Reg. at 46,511.  AIR contends that the words "in the same manner" limits the EPA's actions to either an approval or a disapproval of a state-submitted plan since those were the only actions originally available to the EPA when presented with the SIP.

The words "in the same manner" refer to the EPA's original action of "approving, disapproving, or promulgating any plan" that was taken in error.  42 U.S.C. § 7410(k)(6).  The statute itself does not clearly state whether "in the same manner" is a procedural or substantive requirement.  Because Congress has not directly spoken to the issue at hand, the court will proceed to the second *Chevron* step.

### b.  Chevron Step Two

The EPA reasons that "in the same manner" refers to procedural processes when read in the context of the provision as a whole.  *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) (applying the principle that "a word is known by the company it keeps").  Specifically, the section authorizes the EPA to act "without requiring any further submission from the State" and requires it to provide the "determination and the basis thereof" of its error.  42 U.S.C. § 7410(k)(6).  Both state submissions and "determination and the basis" are procedural requirements, lending support to the EPA's procedural reading of "in the same manner."  The Supreme Court has also interpreted the phrase "in the same manner," as it existed in the Affordable Care Act, as a procedural one.  *See Nat'l Federation of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2583–84 (2012) (holding that the statute's directive to assess a penalty "in the same manner" as taxes meant the Secretary of the Treasury should apply the "same 'methodology and procedures'" used to collect taxes).  The EPA has held to this interpretation of "in the same manner" for as long as it has applied § 110(k)(6).  *See* 58 Fed. Reg. 49,254, 49,257 (Sept. 22, 1993); *see also Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (declaring that the court "normally accord[s] particular deference to an agency interpretation of 'longstanding' duration").

This court determines that the EPA reasonably interpreted "in the same manner" as a procedural requirement.  In this instance, the EPA acted through a notice-and-comment rulemaking, the same process used to approve the 2004 NSR Rules into the SIP. Therefore, the EPA did not exceed its authority under the CAA and its

promulgation of 40 C.F.R. § 52.245 comported with the procedural requirements of § 110(k)(6).

### 2.  Interpretation of "appropriate"

#### a.  Chevron Step One

The court must determine next whether § 110(k)(6) enables the EPA to revise an error by retroactively limiting the scope of its approval to cover only certain parts of the NSR Rules.  In other words, was the EPA's correction "appropriate" under the plain meaning of § 110(k)(6)?

The word "appropriate" "means only 'specially suitable: fit, proper.'"  *Ruckleshaus v. Sierra Club*, 463 U.S. 680, 682 (1983) (quoting Webster's Third International Dictionary).  Section 110(k)(6) itself does not clearly define what  is an "appropriate" action.  Thus, this court concludes that the language does not directly speak to the matter at hand and will proceed to *Chevron* step two.

#### b.  Chevron Step Two

As long as the EPA's interpretation of "appropriate" is "based on a permissible construction of" § 110(k)(6), then the court must accept it.  *Chevron*, 467 U.S. at 843.

AIR argues that § 110(k)(6) does not allow the EPA to "*sua sponte* promulgate a regulation that substantively amends or limits a SIP."  This reading, however, ignores the direction of § 110(k)(6) that the EPA revise its actions when an error has been made "without requiring any further submission from the State."    42 U.S.C. § 7410(k)(6).  The plain meaning of these words indicates unilateral action by the EPA.  While it is true that agencies do not have plenary authority in absence of congressional

limitation, *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act . . . unless and until Congress confers power upon it"), the Supreme Court has interpreted Congress's command elsewhere to take "appropriate action" as giving an agency "a substantial amount of latitude in choosing the programs and techniques they would use to meet their obligations under the [statute]." *Horne v. Flores*, 557 U.S. 433, 440–41 (2009) (quoting *Castaneda v. Pickard*, 648 F.2d 989, 1009 (5th Cir. 1981)).

Under the circumstances of this case, the court finds that the EPA's understanding of "appropriate" was permissible. First, the EPA's interpretation of "appropriate" contemplated the goals and purposes of the CAA as a whole. *See Richards v. United States*, 369 U.S. 1, 11 (1962) (affirming that "in fulfilling our responsibility in interpreting legislation, 'we . . . (should) look to the provisions of the whole law, and to its object and policy'"). The EPA's action preserves the "strengthening aspects" of the 2004 NSR Rules, which removed the total exemption for agricultural sources, while still ensuring that the SIP matches state law. *See* 78 Fed. Reg. 46,504, 46,511 (Aug. 1, 2013). The EPA considered a complete retroactive disapproval of the 2004 NSR Rules, but determined it would have had a "deleterious effect" on the SIP by loosening the air pollution controls even further. *Id.* When faced with a choice between a narrower revision that serves to improve air quality and a broader one that undoes the progress made in the SIP, the EPA permissibly reasoned it was more appropriate to choose the former.

Second, the EPA's method of correction is "appropriate" because it is the only method that would fix the unusual problem at issue here. *See* 78 Fed. Reg. at

46,510.  AIR argues that the only "appropriate" responses the EPA could take to correct its error are the ones provided in § 110(k), namely a partial approval/partial disapproval, a limited approval/limited disapproval, a conditional approval, a SIP Call, or a complete disapproval. *See* U.S.C. § 7410(k).  The EPA demonstrates, however, why each of those options fails to correct the error in this specific instance.

Section 110(k)(3) authorizes the EPA to make a partial approval/partial disapproval if portions of the SIP do not comply with the CAA and are separable, but NSR Rules are not separable.  78 Fed. Reg. at 46,511.  A limited approval/limited disapproval is similarly unsuitable because it would "incorporate the entire rule into the California SIP, and thus would not remedy the problem of the mismatch." *Id.* at 46,510.  A conditional approval under § 110(k)(4) requires the state to correct deficiencies within a year, but as the EPA explains, even though California had corrected its deficiencies by submitting the new 2010 NSR Rules, this did nothing to correct its mistake retroactively.  Likewise, a SIP Call requiring a state to submit a revision provides only a prospective, not a retroactive solution. *See Alabama Envtl. Council*, 711 F.3d at 1290 (distinguishing § 110(k)(6) from a § 110(k)(5) SIP Call as an alternative way to revise a SIP).[9]

---

[9] AIR argues that just because a SIP Call does not facilitate the EPA's desired retroactive outcome, does not mean it is inappropriate.  But if an option is not "suitable" or "fit" to revise an erroneous action, then that option is not "appropriate" by the definition of the word.  *See Ruckleshaus*, 463 U.S. at 682.

Perhaps most significantly, the EPA's revision was "appropriate" because it respected state law. The CAA imposes a duty on the states to meet the standards for air quality through state control programs. 42 U.S.C. § 7407(a). AIR argues that the EPA's action violates the "Clean Air Act's state-federal partnership" because it is stepping out of its role of a "regulatory backstop" to amend the SIP. However, California did not intend the 2004 NSR Rules to omit SB 700's limited exemptions for minor agricultural sources. After AIR brought the citizen suits, California submitted amended District NSR Rules with the explicit limitations taken from SB 700. *See* 75 Fed. Reg. 4745 (January 29, 2010). By revising its past approval to align with the intent of the state, the EPA did not impose its own policy choices on the state. Instead, the EPA appropriately respected California's role as envisioned in the CAA.

This court determines that the EPA's interpretation of § 110(k)(6) prevails under the second step of *Chevron* because it is reasonable that Congress, by amending the CAA to add § 110(k)(6), was providing the EPA with the authority to act in ways other than those enumerated in § 110(k). The EPA has shown that its chosen method was a method – albeit not the only one – that enabled it to fix its mistake in light of the particular circumstances and goals of the CAA. Therefore, this court defers to its interpretation under the circumstances of the instant case.

## III. Conclusion

As discussed herein, this court holds that the EPA did not abuse its discretion in correcting its prior approval of the 2004 NSR Rules. Its action was permissible in light of the fact that California law (SB 700) did not authorize the San Joaquin Air Control District to require permits for the

agricultural sources involved here. Because those rules conflicted with state law, they should not have been incorporated into the State Implementation Plan in 2004. Moreover, the EPA properly acted to revise retroactively the scope of its approval of the 2004 NSR Rules.

The Petition for Review is **DENIED**.